UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JOHN A. OLSSON,

                                    Plaintiff,                    **ORDER**

            v.                                                    18 Civ. 8815 (PGG)

ABM TAXI DISPATCH LAGUARDIA
AIRPORT,

                                    Defendant.

PAUL G. GARDEPHE, U.S.D.J.:

            In this action, pro se Plaintiff John Olsson alleges that ABM Aviation, Inc.

("ABM") – incorrectly named in the caption as "ABM Taxi Dispatch Laguardia Airport" –

wrongfully terminated his employment after he was involved in a verbal altercation with another

ABM employee on May 18, 2018. (Cmplt. (Dkt. No. 1-1) at 8, 17)[1]

            The Complaint contains no allegations whatsoever, but simply reads "see attached

documents." (Id. at 4) The documents attached to the Complaint include a rambling factual

statement from Plaintiff, in which he discusses his eleven months of employment at ABM, his

relationships with fellow taxi dispatchers, and a "ghetto" "sub culture that existed within the

ranks of ABM taxi dispatching." (Id. at 7-17) Also attached are two handwritten complaints that

Olsson made to ABM. (Id. at 20-25) Read very broadly, the materials attached to the Complaint

suggest claims for race discrimination, hostile work environment, and retaliation in violation of

federal, state, and city law, and a state law claim for wrongful termination. ABM has moved to

---

[1] The page numbers referenced in this Order correspond to the page numbers designated by this
District's Electronic Case filing system.

dismiss pursuant to Fed. R. Civ. P. 12(b)(6) or, in the alternative, for summary judgment pursuant to Fed. R. Civ. P. 56. [2]

## BACKGROUND

### I.      FACTS

Plaintiff Olsson worked for 11 months as a a taxi dispatcher for ABM, which "operates out of LaGuardia Airport." (Id. at 7-8)  On May 18, 2018, Plaintiff "got into a verbal altercation" with a fellow dispatcher, Sierra Orval, "which led to [his] termination." (Id. at 8) During the altercation, Plaintiff "used the "'N' word' against [Orval], after she insulted [Plaintiff's] mother and daughter." (Id. at 11)  Plaintiff asserts that he was wrongfully terminated, because the altercation was the result of ABM "managers fail[ure] to address and correct a hostile work environment." (Id. at 7)  According to Plaintiff, prior to the May 18, 2019 altercation, ABM managers had permitted dispatchers to frequently "use[] the 'N' word," "touch[] each other inappropriately physically," and "play[] music from their cell phone[s] where the lyrics were vulgar, sexist, and even racist." (Id. at 11)  Plaintiff further alleges that "this hostile environment . . . led to a situation [in] which [he] used the 'N' word" after having been "antagonize[d] into using [it]." (Id.)

Plaintiff describes himself as "an Oriental male" and asserts that he was subjected to "reverse racism" at ABM. (Id. at 8, 17)  He describes a conversation in which "Orval . . . referred to Asians as having 'chinky' eyes," and an incident in which Brandi Carlos – another ABM employee – "threatened to 'kick [his] ass.'" (Id. at 12, 14)  Plaintiff complained about

---

[2] Defendant served on Plaintiff the "Notice to Pro Se Litigant" required by Local Rule 12.1. (Dkt. No. 12)

Carlos's conduct, and "was told by managers that they would set up a meeting, but several weeks went by, and nothing was done." (Id.)

In a December 21, 2017 handwritten complaint to ABM that is attached to the Complaint, Plaintiff states that he is "bring[ing] to the attention of managers and supervisors[] an incident which occurred [on] Dec. 20, 2017, between [Plaintiff] and . . . Devonte Beckham, . . . where [Beckham] deliberately impeded [Plaintiff's] ability to do [his] job, and . . . threatened physical violence." (Dkt 1-1 at 20). The complaint does not mention Plaintiff's or Beckham's race or national origin, nor does it suggest that any statements Beckham made to Plaintiff were motivated by discriminatory animus. Instead, the dispute between Plaintiff and Beckham arose from Beckham playing "loud" and "vulgar" "gangsta" rap music in their work area. (Id. at 20-22)

In an April 24, 2018 handwritten complaint to ABM that is attached to the Complaint, Plaintiff states that is "fil[ing] a complaint against Brandi [Carlos], so that her vulgar, vindictive . . . behavior coupled with her incompetence, does not affect the well being of passengers and the production workflow of the LGA taxi dispatching." (Id. at 23) As with the December 20, 2017 complaint, the April complaint makes no mention of Plaintiff's or Carlos's race or national origin, nor does it suggest that any statements that Carlos made to Plaintiff were motivated by discriminatory animus. Instead, the dispute between Plaintiff and Carlos appears to arise from Plaintiff's complaints to Carlos that she was negligent in performing her duties, and her "vulgar threats" in response. (Id. at 23-25)

In his factual statement, Plaintiff further alleges that – after his termination – ABM "Supervisor Naomi" "made biased and harmful statements and references to prospective employers about [him]." (Id. at 16) Plaintiff states that he "applied for a position at the

3

Lexington Hotel at 48th St through TLC employment," and "when the [Lexington Hotel] manager called ABM for [a] reference . . . , Naomi said such derogatory remarks that the manager at TLC told me that my application could not be considered." (Id.)

Plaintiff seeks $26,000 in damages "as fair compensation for the suffering and harm done to [his] life due to [ABM's] failure to correct a work environment situation." (Id. at 17)

## II.   **PROCEDURAL HISTORY**

The Complaint was filed on September 7, 2018, in Supreme Court of the State of New York, New York County. (Cmplt. (Dkt. No. 1-1) at 2)  As discussed above, the Complaint does not plead causes of action, but instead consists of Plaintiff's factual statement and copies of two handwritten complaints he submitted to ABM about alleged misconduct committed by Plaintiff's co-workers.  Reading the materials attached to the Complaint liberally, as is required, see Wilder v. U.S. Dep't of Veterans Affairs, 175 F. Supp. 3d 82, 87 (S.D.N.Y. 2016), Plaintiff asserts claims for wrongful termination, hostile work environment, race discrimination, and retaliation.  The Court construes Plaintiff's hostile work environment, race discrimination, and retaliation claims as having been brought under Title VII, 42 U.S.C. § 2000e, et seq.; the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 296, et seq.; and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-107(1)(a).

On September 26, 2018, ABM removed Plaintiff's action to federal court. (Dkt. No. 1)  In its notice of removal, ABM asserts that this Court has original jurisdiction over Plaintiff's action under 28 U.S.C. § 1331 based on Section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185.  (Notice of Removal (Dkt. No. 1) ¶ 3)  ABM further contends that "Plaintiff's Complaint is preempted [by Section 301] because the allegations

4

regarding his alleged wrongful discharge are expressly governed by the terms of' a collective

bargaining agreement (the "CBA") between ABM and Plaintiff's union – Local 74, United

Service Workers, IUJAT (the "Union"). (Notice of Removal (Dkt. No. 1) ¶¶ 3, 13) ABM argues

that, "[i]n asserting that ABM wrongfully discharged him, Plaintiff is alleging a breach of the

CBA," and accordingly his allegations "must be treated as a § 301 claim." (Id. ¶ 13)

ABM now moves to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) or, in the

alternative, for summary judgment under Fed. R. Civ. P. 56. (Dkt. No. 14)

## DISCUSSION

## I. WHETHER ABM'S MOTION TO DISMISS SHOULD BE CONVERTED TO A MOTION FOR SUMMARY JUDGMENT

In support of its motion to dismiss, ABM has submitted the following documents:

(1) Plaintiff's June 9, 2017 application for membership in the Union (Dkt. No. 13-2); (2)

excerpts from the collective bargaining agreement between ABM and the Union (Dkt. No. 13-3);

and (3) the "Mutual Arbitration Agreement" between Plaintiff and ABM. (Dkt. No. 13-4). At

the request of this Court (Dkt. No. 18), ABM also submitted a declaration from Fred Surace,

Vice President of Labor Relationships with ABM Industries Inc., regarding whether ABM has

any record of a grievance filed by the Plaintiff's union regarding Plaintiff's termination. (Dkt.

No. 19) These documents are relevant to ABM's argument that Plaintiff's wrongful termination

claim is preempted by Section 301 of the Labor Management Relations Act.

Federal Rule of Civil Procedure 12(d) provides that "[i]f, on a motion under R.

12(b)(6) . . . matters outside the pleadings are presented to and not excluded by the court, the

motion must be treated as one for summary judgment under Rule 56. All parties must be given a

reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P.

12(d).

Accordingly, where, as here, a court considering a motion to dismiss is "presented with matters outside the pleadings," there are "two options." Chambers v. Time Warner, Inc., 282 F.3d 147, 154 (2d Cir. 2002). The court either "exclude[s] the extrinsic documents," or it "convert[s] the motion to one for summary judgment," giving the parties adequate notice and an opportunity to "submit the additional supporting material contemplated by Rule 56." Id. (citing Carter v. Stanton, 405 U.S. 669, 671 (1972) (per curiam); Friedl v. City of N.Y., 210 F.3d 79, 83-84 (2d Cir. 2000); Morelli v. Cedel, 141 F.3d 39, 45-46 (2d Cir. 1998)). "'Federal courts have complete discretion to determine whether . . . to convert [a] motion [to dismiss] to one for summary judgment.'" Abbey v. 3F Therapeutics, Inc., No. 06 Civ. 409 (KMW), 2009 WL 4333819, at *5 (S.D.N.Y. Dec. 2, 2009) (quoting Carione v. United States, 368 F. Supp. 2d 186, 191 (E.D.N.Y. 2005)).

"'The essential inquiry in determining whether it is appropriate to convert a motion [to dismiss] into a motion for summary judgment is whether the non-movant should reasonably have recognized the possibility that the motion might be converted into one for summary judgment or was taken by surprise and deprived of a reasonable opportunity to meet facts outside the pleadings.'" Ferguson v. Jones, 10 Civ. 817 (PGG), 2011 WL 4344434, at *2 (S.D.N.Y. Sept. 12, 2011) (alteration in original) (quoting Costor v. Sanders, No. 07 Civ. 11311 (NRB), 2009 WL 1834374, at *2 (S.D.N.Y. June 16, 2009)).

Here, ABM requests that -- if the Court finds it necessary to consider evidence outside the pleadings -- "the Court analyze the motion as one for summary judgment" under Fed. R. Civ. P. 56. (Def. Br. (Dkt. No. 14) at 8 n.5) As noted above, and as required by Local Rule 12.1, ABM provided Plaintiff with a notice explaining that ABM's motion to dismiss might be

converted to a motion for summary judgment, and that Plaintiff's claims "MAY BE

DISMISSED WITHOUT A TRIAL IF YOU DO NOT RESPOND TO THIS MOTION ON

TIME by filing sworn affidavits as required by Rule 56(c) and/or other documents." (Dkt. No.

12) (emphasis in original) Plaintiff has not opposed conversion. Accordingly – with respect to

ABM's Section 301 argument – ABM's motion to dismiss will be converted to a motion for

summary judgment.

## II.    JURISDICTION

Although Plaintiff has not challenged Defendant's removal of this action to

federal court, this Court "ha[s] an independent obligation to determine whether subject-matter

jurisdiction exists, even in the absence of a challenge from any party." Arbaugh v. Y&H Corp.,

546 U.S. 500, 514 (2006) (citing Ruhrgas AG v. Marathon Oil Co., 526 U.S. 574, 583 (1999)).

"Typically, 'the party asserting federal jurisdiction bears the burden of establishing jurisdiction,'

and in the case of an action that has been removed from state to federal court, the removing party

must demonstrate that the federal court 'would have had original jurisdiction to hear the

[removed] claim[s].'" Robinson v. Berkshire Life Ins. Co. of Am., No. 18-CV-7689 (JPO), 2019

WL 1614831, at *2 (S.D.N.Y. Apr. 16, 2019) (internal citations omitted) (quoting Blockbuster,

Inc. v. Galeno, 472 F.3d 53, 57 (2d Cir. 2006)); Montefiore Med. Ctr. v. Teamsters Local 272,

642 F.3d 321, 327 (2d Cir. 2011)).

ABM asserts that Plaintiff's wrongful termination claim is preempted by Section

301 of the LMRA, which confers federal jurisdiction over "[s]uits for violation of contracts

between an employer and a labor organization representing employees in an industry affecting

commerce." 29 U.S.C. 185(a); see also Allis-Chalmers Corp. v. Lueck, 471 U.S. 202, 220

(1985) ("[W]hen resolution of a state-law claim is substantially dependent upon analysis of the

terms of an agreement made between the parties in a labor contract, that claim must either be

treated as a § 301 claim, or dismissed as pre-empted by federal labor-contract law." (internal citation omitted)).

As discussed below, this Court concludes that it has federal question jurisdiction based on Section 301 of the LMRA. Moreover, because the Court construes the Complaint as raising claims under Title VII, Plaintiff's hostile work environment, race discrimination, and retaliation claims provide a separate basis for the exercise of federal question jurisdiction. Finally, because Plaintiff's NYSHRL and NYCHRL claims arise from the same "common nucleus of operative facts" as Plaintiff's Title VII claims, this Court has supplemental jurisdiction over Plaintiff's NYSHRL and NYCHRL claims under 28 U.S.C. § 1367. See Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 349 (1988).

## III.   **WRONGFUL TERMINATION**

### A.   **Summary Judgment Standard**

Summary judgment is warranted where a moving party shows that "there is no genuine dispute as to any material fact" and that that party "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor." Beyer v. Cnty. of Nassau, 524 F.3d 160, 163 (2d Cir. 2008) (citing Guilbert v. Gardner, 480 F.3d 140, 145 (2d Cir. 2007)). In deciding a summary judgment motion, the Court "'resolve[s] all ambiguities, and credit[s] all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment.'" Spinelli v. City of New York, 579 F.3d 160, 166 (2d Cir. 2009) (quoting Brown v. Henderson, 257 F.3d 246, 251 (2d Cir. 2001)). However, a "'party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment . . . . [M]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist.'"

8

Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (alterations in original) (quoting Fletcher v. Atex, Inc., 68 F.3d 1451, 1456 (2d Cir. 1995)).

"A pro se plaintiff is entitled to 'special latitude' [in this analysis]," Harry v. Suarez, No. 10 Civ. 6756 (NRB), 2012 WL 2053533, at \*2 (S.D.N.Y. June 4, 2012) (quoting Salahuddin v. Coughlin, 999 F. Supp. 526, 535 (S.D.N.Y. 1998)), "as the Court must construe such a plaintiff's submissions liberally and interpret them to raise the strongest arguments they suggest." Id. (citing Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir. 1994)). "This lenient standard, however, does not relieve a pro se plaintiff of 'his duty to meet the requirements necessary to defeat a motion for summary judgment.'" Id. (quoting Jorgensen v. Epic/Sony Records, 351 F.3d 46, 50 (2d Cir. 2003)).

## B.    Preemption

ABM argues that any claim relating to Plaintiff's wrongful termination "is a grievable dispute that can only be resolved through the CBA's procedures." (Def. Br. (Dkt. No. 14) at 14). Before resolving whether Plaintiff has failed to exhaust the grievance procedures set forth in the CBA, however, this Court must determine whether Plaintiff's state law claims are pre-empted by Section 301 of LMRA. See Johnson v. D.M. Rothman Co., 861 F. Supp. 2d 326, 331 (S.D.N.Y. 2012) ("Section 301 requires that an employee exhaust the governing CBA's grievance procedures before bringing a claim for breach of a CBA under the LMRA.") Defendant has offered evidence that – during his employment with ABM – Plaintiff was a member of United Services Workers Union Local 74. (Blank Decl., Ex. B (Dkt. No. 13-2) (Application for Union Membership) at 2) Plaintiff does not dispute that he was a member of the Union. (See Cmplt. (Dkt. No. 1-1) at 16 ("This was even before the investigation by union rep and managers were [sic] completed."))

9

Section 301 of the LMRA "governs actions by an employee against an employer for breach of a collective bargaining agreement." Dougherty v. American Tel. and Tel. Co., 902 F.2d 201, 203 (2d Cir. 1990); see also Heaning v. Nynex-New York, 945 F. Supp. 640, 645 (S.D.N.Y. 1996) (stating same). Suits arising under Section 301 include "those seeking to vindicate 'uniquely personal' rights of employees such as wages, hours, overtime pay, and wrongful discharge." Hines v. Anchor Motor Freight, 424 U.S. 554, 562 (1976) (quoting Smith v. Evening News Ass'n., 371 U.S. 195, 199 (1962)). Accordingly, Section 301 preempts state law claims in any case involving the interpretation of rights and responsibilities under "a collective bargaining agreement, regardless of whether the plaintiff's claims sound in tort or contract." Cespuglio v. Ward, No. 03 CIV. 8603, 2004 WL 1088235, at *3 (S.D.N.Y. May 13, 2004) (citing Allis-Chalmers Corp., 471 U.S. at 220 (state law claims are preempted to the extent that resolution of those claims "is substantially dependent upon analysis of the terms of an agreement made between the parties in a labor contract")); see also Vera v. Saks & Co., 335 F.3d 109, 114 (2d Cir. 2003) ("'When resolution of a state-law claim is substantially dependent upon analysis of the terms of an agreement made between the parties in a labor contract, that claim must either be treated as a § 301 claim, or dismissed as pre-empted by federal labor-contract law.'" (quoting Allis-Chalmers Corp, 471 U.S. at 220)).

Here, Plaintiff's wrongful termination allegations are substantially dependent upon analysis of the terms of the CBA. For example, pursuant to the CBA, ABM has the right to discharge employees "for cause" and "for major offenses." (CBA, Art. VIII, §§ 1, 3 (Dkt. No. 13-3)) Resolution of Plaintiff's wrongful termination claim will thus depend on the meaning and interpretation of CBA provisions that authorize ABM to terminate employees. As such, his wrongful termination claim is preempted by Section 301 of the LMRA.

10

To the extent that Plaintiff's claim could be construed as wrongful termination in breach of contract, any such claim would be premised on CBA provisions that speak to discipline and discharge of employees. (See CBA, Art. VIII, §§ 1-4 (Dkt. No. 13-3)) Because such claims cannot be resolved without interpretation of these CBA provisions, they are preempted by Section 301 of the LMRA. See Lever v. Entergy Nuclear Operations Inc., No. 15-CV-3327(KAM), 2016 WL 1627619, at *3 (E.D.N.Y. Apr. 22, 2016) (breach of contract and wrongful termination claims are preempted by Section 301, because they depend on the interpretation of a collective bargaining agreement provision permitting employer to fire employees for "just cause"); Romero v. DHL Express, Inc., No. 12-CV-1942 VEC RLE, 2015 WL 1315191, at *6 (S.D.N.Y. Mar. 24, 2015) (plaintiff alleged that "by creating a hostile work environment, and by subjecting him to discrimination, retaliation, and wrongful termination," employer "breached its contract with him"; held that breach of contract claim was preempted because it was "based on the CBA"); Civardi v. Gen. Dynamics Corp., 603 F. Supp. 2d 393, 397-98 (D. Conn. 2009) (plaintiff alleged that he was "'unlawfully, wrongfully, without just cause and in bad faith' discharged"; court held that plaintiff's wrongful discharge and breach of contract claims were preempted, because "any limitation on [the employer's] right to terminate the plaintiff's employment would arise from the CBA and depend upon the meaning and interpretation" of the "just cause" provision in the CBA).

In sum, Plaintiff's wrongful termination claim is preempted by Section 301 of the LMRA.

## C.   **Exhaustion of Grievance Procedures**

"It has long been established that an individual employee may bring suit against his employer for breach of a collective bargaining agreement." DelCostello v. Int'l Bhd. of Teamsters, 462 U.S. 151, 163 (1983). "Ordinarily, however, an employee is required to attempt

11

to exhaust any grievance or arbitration remedies provided in the collective bargaining agreement." Id. "An employee, however, is excused from this requirement '[i]f the union refuses to press or only perfunctorily presses the individual's claim.'" Sussman v. NYP Holdings, Inc., No. 16-CV-7659 (PKC), 2018 WL 2357256, at *3 (S.D.N.Y. Feb. 22, 2018) (quoting Republic Steel Corp. v. Maddox, 379 U.S. 650, 652 (1965)). "This exception avoids the 'unacceptable injustice' that would arise if an employee were precluded from challenging an employer's breach of the CBA because 'the union representing the employee in the grievance/arbitration procedure acts in such a discriminatory, dishonest, arbitrary, or perfunctory fashion as to breach its duty of fair representation.'" Id. (quoting DelCostello, 462 U.S. at 164).

The CBA at issue here provides for a detailed, multi-step grievance process (see CBA, Art. V (Dkt. No. 13-3)), and includes a provision that addresses grievances premised on alleged wrongful termination:

> In the event that a discharged employee feels that he or she has been unjustly dealt with, the Union shall have the right to file a grievance with the Employer within seven (7) business days from the time of discharge. Notification of an employee's discharge will be sent to the union in writing and/or via email and to the employee at his or her last known address. Said complaint will be treated as a grievance and dealt with in accordance with the arbitration procedure provided in Article V of this Agreement. However, if no grievance is received by the Employer by certified mail within a seven (7) business day period from the time of discharge, then said discharge shall be deemed to be absolute (All discharges are subject to grievance procedure.[)]

(Id. Art. VIII)

Here, the Union did not file a grievance concerning Plaintiff's alleged wrongful termination. (See Surace Decl. (Dkt. No. 19) ¶¶ 7-8) Moreover, Plaintiff has not alleged that the Union breached its duty of fair representation in connection with his alleged wrongful termination. "Because 'it is settled that the employee must at least attempt to exhaust exclusive grievance and arbitration procedures established by the bargaining agreement,' [Plaintiff's] failure to plead such an attempt adequately is fatal to [his] claim for breach of the CBA."

12

Sussman, 2018 WL 2357256, at *4 (quoting Vaca v. Sipes, 386 U.S. 171, 184 (1967)); see id. (holding that "'[a]n employee seeking a remedy for an alleged breach of the collective-bargaining agreement between his union and employer must attempt to exhaust any exclusive grievance and arbitration procedures established by that agreement before he may maintain a suit against his union or employer'" for a breach of the CBA, and is excepted from exhausting the grievance procedure only if the employee can "'carry the burden of demonstrating breach of duty by the Union.'" (quoting Clayton v. Int'l Union, et al., 451 U.S. 679, 686 (1981); United Parcel Servs., Inc. v. Mitchell, 451 U.S. 56, 62 (1981)) (emphasis in original).

Because Plaintiff failed to exhaust the grievance procedures set forth in the CBA, ABM's motion for summary judgment on Plaintiff's wrongful termination claim will be granted.

## IV.   TITLE VII AND NYSHRL CLAIMS[3]

### A.   Motion to Dismiss Standard

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "In considering a motion to dismiss . . . the court is to accept as true all facts alleged in the complaint," Kassner v. 2nd Ave. Delicatessen Inc., 496 F.3d 229, 237 (2d Cir. 2007) (citing Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals, 282 F.3d 83, 87 (2d Cir. 2002)), and must "draw all reasonable inferences in favor of the plaintiff." Id. (citing Fernandez v. Chertoff, 471 F.3d 45, 51 (2d Cir. 2006)).

---

[3] Although there is no evidence in the record that Plaintiff filed a charge of discrimination with an administrative agency, Defendant has not argued that Plaintiff failed to exhaust his administrative remedies.

A complaint is inadequately pled "if it tenders 'naked assertion[s]' devoid of 'further factual enhancement,'" Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 557), and does not provide factual allegations sufficient "to give the defendant fair notice of what the claim is and the grounds upon which it rests." Port Dock & Stone Corp. v. Oldcastle Northeast, Inc., 507 F.3d 117, 121 (2d Cir. 2007) (citing Twombly, 550 U.S. at 555 (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957))).

A "pro se complaint . . . [is] interpret[ed] . . . to raise the 'strongest [claims] that [it] suggest[s].'" Hill v. Curcione, 657 F.3d 116, 122 (2d Cir. 2011) (quoting Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 474 (2d Cir. 2006) (per curiam)); see Weixel v. Bd. of Educ. of City of New York, 287 F.3d 138, 145-46 (2d Cir. 2002) ("When considering [a] motion[] to dismiss a pro se complaint such as this, 'courts must construe [the complaint] broadly. . . .'" (quoting Cruz v. Gomez, 202 F.3d 593, 597 (2d Cir. 2000))). "[A]lthough pro se filings are read liberally and must be interpreted to raise the strongest arguments that they suggest, a pro se complaint must still plead sufficient facts to state a claim to relief that is plausible on its face." Wilder v. United States Dept. of Veterans Affairs, 175 F. Supp. 3d 82, 87 (S.D.N.Y. 2016) (internal quotation marks and citations omitted).  Moreover, "the court need not accept as true 'conclusions of law or unwarranted deductions of fact.'"  Whitfield v. O'Connell, No. 09 Civ. 1925 (WHP), 2010 WL 1010060, at *4 (S.D.N.Y. Mar. 18, 2010) (quoting First Nationwide Bank v. Gelt Funding Corp., 27 F.3d 763, 771 (2d Cir. 1994)); see also Harris v. Mills, 572 F.3d 66, 72 (2d Cir. 2009) ("[T]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice [to establish entitlement to relief]." (internal quotation marks and citation omitted)).

"When determining the sufficiency of [a] plaintiff['s] claim for Rule 12(b)(6)

purposes, consideration is limited to the factual allegations in plaintiff['s] . . . complaint, . . . to

documents attached to the complaint as an exhibit or incorporated in it by reference, to matters of

which judicial notice may be taken, or to documents either in plaintiff['s] possession or of which

plaintiff[] had knowledge and relied on in bringing suit." Brass v. Am. Film Techs., Inc., 987

F.2d 142, 150 (2d Cir. 1993) (citation omitted).  Where "allegations made in a pro se plaintiff's

memorandum of law . . . are consistent with those in the complaint, [however,] [they] may also

be considered on a motion to dismiss." Braxton v. Nichols, 8 Civ. 8568 (PGG), 2010 WL

1010001, at *1 (S.D.N.Y. Mar. 18, 2010) (citations omitted); see also Burgess v. Goord, 98 Civ.

2077 (SAS), 1999 WL 33458, at *1 n.1 (Jan. 26, 1999) (same).

**B.      Race Discrimination**

Plaintiff describes himself as an "Oriental male."  (Cmplt. (Dkt. No. 1-1) at 8)  He

alleges that he was terminated after a verbal altercation in which he "used the 'N' word against

[a black co-worker and fellow dispatcher,] Sierra Orval, after she insulted [Plaintiff's] mother

and daughter."  (Id. at 8, 11)

In the materials attached to the Complaint, Plaintiff recounts an incident in which

a co-worker "referred to Asians as having 'chinky' eyes."  (Id. at 14)  Plaintiff also states that

"the dispatchers with whom the problems occurred with are black, and in Brandi Carlo[s]'s case,

Hispanic," and he claims that these dispatchers engaged in blatant misconduct and were not

punished, while he was fired after one "verbal altercation" with another dispatcher, and without

"a single warning or write up against me by any of the supervisors."  (Id. at 8)  According to

Plaintiff, when he asked ABM supervisors to address the misconduct of a black employee, they

did nothing.  "[B]y not taking any action to address my request, [ABM managers] allowed [the

15

black employee,] Ruben Baptiste to malign my name and reputation, and being a black person, used that factor to influence his opinion on other black co-workers." (Id. at 10)

Plaintiff further claims that ABM "black supervisors . . . coddled [his coworker, Sierra Orval] because she was black. Anyone else who had compiled the amount of write ups and complaints of leaving their posts at whim would have been terminated. There was a double standard here that was very evident." (Id. at 14) Finally, Plaintiff contends that his fellow dispatchers – who were African-American – "used the 'N' word in practically . . . every other sentence that came out of their mouths." (Id. at 11) Plaintiff states that he told his supervisors

> that, in a work place, you can NOT allow one person to use the 'N' word while terminating another for using it, since it allows the black person who uses it to create a passive/aggressive mine field against those they wish to antagonize into using the 'N' word against them and having them terminated, as in my case. The case in point is that management failed to address this hostile environment in [a] timely manner which led to a situation where I used the 'N' word against Sierra Orval, after she insulted my mother and daughter.

(Id. at 11) (emphasis in original).

"[C]laims of discrimination under the NYSHRL are analyzed under the same standard as a Title VII claim." Thomson v. Odyssey House, No. 14-CV-3857 MKB, 2015 WL 5561209, at *14 (E.D.N.Y. Sept. 21, 2015) (citing Vargas v. Morgan Stanley, 438 F. App'x 7, 9 (2011) (summary order); see also Salamon v. Our Lady of Victory Hosp., 514 F.3d 217, 226 n.9 (2d Cir. 2008) (courts "treat Title VII and NYHRL discrimination claims as analytically identical, applying the same standard of proof to both claims"). Title VII prohibits an employer from discriminating "against any individual with respect to . . . compensation, terms, conditions, or privileges of employment, because of such individual's race . . . [or] sex." 42 U.S.C. § 2000e-2(a)(1). To state a Title VII claim, a plaintiff must "allege two elements:  (1) the employer discriminated against him (2) because of his race, color, religion, sex, or national origin." Vega

v. Hempstead Union Free Sch. Dist., 801 F.3d 72, 85 (2d Cir. 2015) (citing 42 U.S.C. § 2000e–
2(a)(1)).  "[A]t the pleadings stage of an employment discrimination case, a plaintiff has
a minimal burden of alleging facts suggesting an inference of discriminatory motivation." Id.
(internal quotation omitted) (emphasis in original).  He "must allege that the employer took
adverse action against [him] at least in part for a discriminatory reason, and [he] may do so by
alleging facts that directly show discrimination or facts that indirectly show discrimination by
giving rise to a plausible inference of discrimination." Id.

        Here, Plaintiff has not offered evidence sufficient to demonstrate that ABM took
adverse action against him in part because of his race.  As an initial matter, there is almost no
direct evidence of discriminatory animus.  The only such evidence is Orval's alleged comment
that Asians as having "'chinky' eyes." (Cmplt. (Dkt. No. 1-1) at 14).  But Orval was Plaintiff's
fellow dispatcher; she was not an ABM supervisor or manager.  (Id.)  Accordingly, her
"comment has little probative value regarding whether plaintiff's employer took adverse action
against him based on his sex or race." Jeanty v. Precision Pipeline Solutions, LLC, et al, No. 18
CV 7721 (VB), 2019 WL 3532157, at *4 (S.D.N.Y. Aug. 2, 2019) (emphasis in original).
Indeed, Plaintiff does not assert that "any supervisor made any discriminatory remarks
[concerning his race]." Id.

        In essence, Plaintiff asks this Court to find that he should have been permitted to
use the "N" word as a racial epithet during his altercation with Orval, because the "N" word was
commonly used by African-American dispatchers talking with each other. (Pltf. Opp. (Dkt. No.
16) at 4)  But Plaintiff's "characterization of [his use of] the slur fails to recognize its historical
baggage.  The term itself evinces a hatred and disgust of African-Americans and invokes
dehumanizing stereotypes that served to justify centuries of social, economic and political

discrimination." Drouillard v. Sprint/United Mgmt. Co., 375 F. Supp. 3d 245, 262 (E.D.N.Y.

2019) Accordingly, its use as a racial epithet cannot be condoned under any circumstances:

> "Courts have repeatedly concluded that the use of the word 'nigger' in the workplace is
> particularly odious and offensive." Anderson v. Phoenix Beverages, Inc., No. 12-cv-
> 1055, 2017 WL 9481014, at *14 (E.D.N.Y. July 17, 2017), report and recommendation
> adopted, 2017 WL 4767447 (E.D.N.Y. Sept. 30, 2017).  As the Second Circuit has
> "emphasize[d]," "perhaps no single act can more quickly alter the conditions of
> employment and create an abusive working environment than the use of an
> unambiguously racial epithet such as 'nigger[.]'"  Rivera v. Rochester Genesee Reg'l
> Transp. Auth., 743 F.3d 11, 24 (2d Cir. 2014); see also White v. BFI Waste Servs., LLC,
> 375 F.3d 288, 298 (4th Cir. 2004) ("'Far more than a "mere offensive utterance, the word
> "nigger" is pure anathema to African-Americans.'"); Hrobowski v. Worthington Steel
> Co., 358 F.3d 473, 477 (7th Cir. 2004) ("Given American history, we recognize that the
> word 'nigger' can have a highly disturbing impact on the listener.  Thus, a plaintiff's
> repeated subjection to hearing that word could lead a reasonable factfinder to conclude
> that a working environment was objectively hostile.").  In fact, the word is so abhorrent
> that "there may well exist circumstances where a single use of the word 'nigger' would
> rise to the level of a hostile work environment." Albert-Roberts v. GGG Const., LLC,
> 542 F. App'x 62, 64 (2d Cir. 2013); see also Lovejoy v. Gure-Perez, No. 10-cv-5748,
> 2014 WL 2459656, at *5 (E.D.N.Y. May 21, 2014) ("Plaintiff testified that she was
> called 'nigger' by her supervisor in an aggressive and intimating tone, with saliva falling
> onto her body, and loudly enough for others to hear it. Whether considered alone or with
> additional evidence, this is sufficient to create a hostile work environment.").

Id.

The Court concludes that Plaintiff has not pled a plausible claim of race

discrimination under Title VII and the NYSHRL.  Accordingly, these claims will be dismissed.

### C.  Hostile Work Environment

ABM argues that "Plaintiff cannot state a hostile work environment claim under

either state or federal law because the facts as pled do not demonstrate that his 'workplace [was]

"permeated with discriminatory intimidation," . . . that [was] sufficiently severe or pervasive to

alter the conditions of his work environment.'"  (Def. Br. (Dkt. No. 14) at 17 (quoting Rivera v.

Rochester Genesee Reg'l Transp. Auth., 743 F.3d 11, 20 (2d Cir. 2012))

"The standard for establishing a hostile work environment under Title VII and the

New York State HRL is essentially the same." Romero, 2015 WL 1315191, at *5 (citing

Schiano v. Quality Payroll Sys., Inc., 445 F.3d 597, 609 (2d Cir. 2006)).  To state a Title VII hostile work environment claim,

> a plaintiff must plead facts that would tend to show that the complained of conduct:  (1) is objectively severe or pervasive – that is, creates an environment that a reasonable person would find hostile or abusive; (2) creates an environment that the plaintiff subjectively perceives as hostile or abusive; and (3) creates such an environment because of the plaintiff's [protected characteristic].

Patane v. Clark, 508 F.3d 106, 113 (2d Cir. 2007) (internal quotation marks, citations, and alterations omitted).  "A plaintiff must show that the conduct at issue is 'severe or pervasive enough to create an objectively hostile or abusive work environment,' and 'the victim must also subjectively perceive that environment to be abusive.'"  Id. (quoting Feingold v. New York, 366 F.3d 138, 150 (2d Cir.2004)).  Factors courts consider in determining whether the alleged conduct is sufficiently severe are "'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with [the] employee's work performance.'"  Feingold, 366 F.3d at 150 (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993)).  "For racist comments, slurs, and jokes to constitute a hostile work environment, there must be 'more than a few isolated incidents of racial enmity.'"  Schwapp v. Town of Avon, 118 F.3d 106, 110 (2d Cir.1997) (quoting Snell v. Suffolk Cty., 782 F.2d 1094, 1103 (2d Cir. 1986)); see also Kotcher v. Rosa and Sullivan Appliance Ctr., 957 F.2d 59, 62 (2d Cir.1992) ("The incidents must be repeated and continuous; isolated acts or occasional episodes will not merit relief.").

        The Court concludes that Plaintiff has not pled facts sufficient to demonstrate that he experienced a hostile work environment.  As an initial matter, Plaintiff cites only one example in which his race was alluded to by a co-worker – when co-worker Sierra Orval "referred to Asians as having 'chinky' eyes."  (Cmplt. (Dkt. No. 1-1) at 14)  This one remark is not sufficient

to demonstrate that Plaintiff experienced a hostile work environment predicated on negative remarks about Asians, much less negative remarks about him.

Plaintiff also alleges that African-American ABM dispatchers "used the 'N' word in practically . . . every other sentence that came out of their mouths." (Id. at 11) It is not clear, however, that a plaintiff can bring a hostile work environment claim predicated on the use of racially derogatory terms, where the racial slur is not directed at plaintiff's race or at plaintiff. See Brooks v. CBS Radio, Inc., No. CIV.A. 07-0519, 2007 WL 4454312, at *12 (E.D. Pa. Dec. 17, 2007), aff'd, 342 F. App'x 771 (3d Cir. 2009) (African-American plaintiff brought a hostile work environment claim premised in part on his supervisor's use of a derogatory term for people of Italian ancestry; court granted defendant summary judgment, because the supervisor's "use of the ethnic slur . . . was not based on [plaintiff's] race, nor was it directed at [plaintiff]").

Moreover, it is apparent from the Complaint's attachments that the African-American dispatchers use of the "N" word with each other did not occur in the context of racial enmity. In order words, the "N" word was not used as a racial epithet. And Plaintiff does not allege that he understood or experienced the African-American dispatchers use of the "N" word as an attack on him. Instead, Plaintiff complains that the use of the "N" word was vulgar, distracting, and "beyond inappropriate in the work place," and reflective of a "ghetto culture" amongst the African-American dispatchers. (Cmplt. (Dkt. No. 1-1) at 8, 11)

Acknowledging that there is no role for the "N" word in the workplace or any place else, it appears that the only instance in which the "N" word was used in a hostile manner – that is, in the context of racial enmity and as a racial epithet – was when Plaintiff used it in his "verbal altercation" with his co-worker, Sierra Orval. And the threats and insults about which Plaintiff complains occurred not because of racial animosity, but because of Plaintiff's

20

complaints about his co-worker's job performance.  (See id. at 12 (stating that Plaintiff's
"request to have [an ABM employee] have the cabs turn on their medallion lights when coming
into the passenger pick up area[] turned into an exchange of personal insults"); id. at 23
(describing an incident in which Plaintiff complained about a co-worker's negligence, and the
co-worker "came storming up . . . , and began spewing vulgar threats"))

    The Court concludes that Plaintiff has not pled facts sufficient to plausibly
demonstrate that he experienced a hostile work environment at ABM.  Accordingly, Defendant's
motion to dismiss Plaintiff's Title VII and NYSHRL hostile work environment claims will be
granted.

   **D.**  **Retaliation**

    Plaintiff claims that after his termination and during his subsequent job search one
of his ABM supervisors – whom he refers to as "Naomi" – "made biased and harmful statements
and references to prospective employers about [him]."  (Id. at 16)  Plaintiff alleges that her
remarks were so "derogatory" that his employment agency "told [him] that [his] application
could not be considered."  (Id.)  In his opposition, Plaintiff asserts that his former ABM
supervisor "stated that [Plaintiff] was a racist and should not be hired."  (Pltf. Opp. (Dkt. No. 16)
at 5)

    "[T]o state a claim for retaliation [under Title VII or the NYSHRL], a plaintiff
must allege '(1) participation in a protected activity; (2) that the defendant knew of the protected
activity; (3) an adverse employment action; and (4) a causal connection between the protected
activities and the adverse employment action.'"  Blutreich v. N. Shore-Long Island Jewish
Health Sys., Inc., No. 13 CIV. 8583 DAB, 2015 WL 1515255, at *4 (S.D.N.Y. Apr. 2, 2015)
(quoting Hicks v. Baines, 593 F.3d 159, 164 (2d Cir. 2010)); see also Jones v. Bloomingdale's,

No. 17-CV-1974 (RA), 2018 WL 1281819, at *5 (S.D.N.Y. Mar. 8, 2018) ("Regardless of whether this claim is construed as a Title VII discrimination claim or Title VII retaliation claim, Plaintiff must allege facts making it plausible that the company's allegedly negative references 'were made for retaliatory reasons' or were motivated by discriminatory animus." (quoting Bluetreich, No. 13-CV-8583 (DAB), 2015 WL 1515255, at *5)).

As to "protected activity, "[t]he anti-retaliation provision of Title VII, codified at 42 U.S.C. § 2000e-3, prohibits an employer from discriminating against an employee or job applicant because that individual opposed any practice made unlawful by Title VII or made a charge, testified, assisted or participated in a Title VII proceeding or investigation." Blutreich, 2015 WL 1515255, at *4 (citing Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 56, 63-64 (2006)).

"As to causation, the plaintiff 'must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer' for his or her Title VII claim to survive." Id. at *4 (quoting Univ. of Tex. Sw. Med. Ctr. v. Nassar, 133 S.Ct. 2517, 2534 (2013)).

The Court concludes that Plaintiff has not pled facts sufficient to make out a Title VII or NYSHRL retaliation claim. No retaliation claim under Title VII or the NYSHRL can survive absent factual allegations demonstrating that plaintiff "opposed [a] practice made unlawful by Title VII [or the NYSHRL]." Id. Here, there is no evidence that Plaintiff ever complained to ABM managers or supervisors about discriminatory practices at ABM during his employment at the company. There is evidence that Plaintiff complained about his co-workers' job performance, threats, and use of cell phones to play "loud and vulgar" "gangsta" rap music

(see Cmplt. (Dkt. No. 1-1) at 20-25), but Plaintiff pleads no facts showing that he complained about discriminatory conduct at ABM.

"[C]omplaints centered on general allegations of harassment [or other mistreatment] unrelated to race . . . are not protected activity under Title VII." Thomas v. iStar Fin., Inc., 438 F. Supp. 2d 348, 365 (S.D.N.Y. 2006).  The statute "requires that the plaintiff has taken, or threatened to take, some action to protest or oppose illegal discrimination [as defined under Title VII]." Correa v. Mana Prods., Inc., 550 F. Supp. 2d 319, 327 (E.D.N.Y. 2008). Because Plaintiff has not pled facts suggesting that he took action to oppose any practice made unlawful by Title VII or the NYSHRL, he has not demonstrated that he engaged in "protected activity."

As to causation, Plaintiff claims that "Naomi" provided him with a negative reference not because he had engaged in "protected activity," but rather because she "is friends with [Plaintiff's] nemesis, Devonte Beekman." (Pltf. Opp. (Dkt. No. 16) at 5)  Given that Plaintiff has not alleged that "that the speaker . . . providing the references . . . , expressed negative views of [Plaintiff] based on discriminatory animus or for retaliatory reasons," Jones, 2018 WL 1281819, at *5, there "is no legal or factual basis for [his] retaliation claim." McCalman v. Partners in Care, No. 01 CIV.5844(FM), 2003 WL 22251334, at *7 (S.D.N.Y. Sept. 30, 2003).

Defendant's motion to dismiss Plaintiff's Title VII and NYSHRL retaliation claims will be granted.

## V.   NYCHRL CLAIMS

A district court "may decline to exercise supplemental jurisdiction over a claim" once it "has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c). "Courts in this District routinely decline to exercise supplemental jurisdiction over a plaintiff's

NYCHRL claims after dismissing all federal claims." Espinoza v. New York City Dep't of Transp., 304 F. Supp. 3d 374, 391 (S.D.N.Y. 2018); see also Harris v. NYU Langone Med. Ctr., No. 12 Civ. 0454(RA), 2014 WL 941821, at *1-2 (S.D.N.Y. Mar. 11, 2014) (declining to exercise jurisdiction over NYSHRL and NYCHRL claims); Algarin v. City of New York, No. 12 Civ. 1264(LTS), 2012 WL 4814988, at *4 (S.D.N.Y. Oct. 10, 2012) (same); Mabry v. Neighborhood Def. Serv., 769 F.Supp.2d 381, 402 (S.D.N.Y. 2011) (same).  Furthermore, "comity counsels against exercising jurisdiction over [a plaintiff's] NYCHRL claim[s], as the NYCHRL has a lower threshold of proof than its federal counterparts and has been applied primarily at the intermediate appellate level of the state courts, with limited opportunity for the New York Court of Appeals to construe it." Harris, 2014 WL 941821, at *2 (internal quotation marks omitted).

Accordingly, this Court declines to exercise supplemental jurisdiction over Plaintiff's NYCHRL claims, and these claims will be dismissed without prejudice to re-filing in state court.

## VI.   **LEAVE TO AMEND**

With respect to leave to amend, the Second Circuit has cautioned that district courts "should not dismiss [a pro se complaint] without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." Cuoco v. Moritsugu, 222 F.3d 99, 112 (2d Cir. 2000).  "'Where it appears that granting leave to amend is unlikely to be productive, however, it is not an abuse of discretion to deny leave to amend.'" Lucente v. Int'l Bus. Machines Corp., 310 F.3d 243, 258 (2d Cir. 2002) (quoting Ruffolo v. Oppenheimer & Co., 987 F.2d 129, 131 (2d Cir. 1993) (per curiam)).  "One appropriate basis for denying leave to amend is that the proposed amendment is futile . . . . An

amendment to a pleading is futile if the proposed claim could not withstand a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6)." Id. (internal citations omitted).

At this juncture, the Court cannot say that amendment would be futile as to Plaintiff's discrimination, hostile work environment, and retaliation claims. Accordingly, Plaintiff is granted leave to move to amend as to those claims. Any motion for leave to file an Amended Complaint must allege facts showing, among other things, that (1) Plaintiff was discharged because of his race; (2) he subjectively experienced a hostile work environment; and (3) ABM would not have provided him with a negative reference but for his engagement in a "protected activity." The proposed Amended Complaint must be attached as an exhibit to the motion.

## CONCLUSION

For the reasons stated above, (1) ABM's motion to dismiss Plaintiff's wrongful termination claim is converted to a motion for summary judgment; (2) ABM is granted summary judgment on Plaintiff's wrongful termination claim; and (3) ABM's motion to dismiss Plaintiff's Title VII, NYSHRL, and NYCHRL claims is granted. The Clerk of Court is directed to terminate the motion. (Dkt. No. 11)

Any motion for leave to file an Amended Complaint is to be filed by October 15, 2019.

The Clerk of Court is directed to mail a copy of this order by certified mail to John A. Olsson, 239 West 10th Street, New York, New York 10014.

Dated: New York, New York
       September 17, 2019

SO ORDERED.

Paul A. Gardephe

Paul G. Gardephe
United States District Judge

25